# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 7, 2016

## IN RE: A'LEAH M., ET AL.

### Appeal from the Juvenile Court for Knox County
No. 127109    Tim Irwin, Judge

_____

### No. E2015-01234-COA-R3-PT-FILED-FEBRUARY 23, 2016

_____

Tanisha M. ("Mother") appeals the order of the Juvenile Court for Knox County ("Juvenile Court") terminating her parental rights to the minor children A'Leah M. ("the Older Child") and Sh Myah M. ("the Younger Child" or collectively "the Children") for abandonment by willful failure to pay child support pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i), for failure to comply with a permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2), and for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). We find and hold that the evidence does not preponderate against the findings of the Juvenile Court made by clear and convincing evidence that grounds were proven to terminate Mother's parental rights to the Children and that it was in the Children's best interest for Mother's parental rights to be terminated. We, therefore, affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Robin Gunn, Knoxville, Tennessee, for the appellant, Tanisha M.

Herbert H. Slatery, III, Attorney General and Reporter; and Kathryn A. Baker, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Children were removed from Mother's custody for the second time in March of 2012 by order of the Juvenile Court and have been in foster care continuously since that time. The State of Tennessee Department of Children's Services ("DCS") filed its petition seeking to terminate Mother's parental rights to the Children on January 22, 2015. The case proceeded to trial in May of 2015.

Terrie Delp, the DCS case manager assigned to the Children's case, testified at trial. Ms. Delp has been the case manager on this case since May of 2012. Ms. Delp explained that the Children being removed from Mother's custody and placed in foster care in March of 2012 was the second time they had entered foster care. The first time the Children were placed in foster care was in September of 2011 due to allegations of physical abuse of one of the Children. Ms. Delp testified that the Children ran away from home and reported that Mother had hit one of the Children several times in the face and had kicked her. The Children reported that Mother had woken them up around one o'clock in the morning because they had failed to clean their room and became upset because one of the Children had wet the bed.

An initial permanency plan ("Permanency Plan") for the Children was developed in October of 2011. Initially, the Children were placed with their maternal grandparents on a trial home placement. The grandparents, however, violated the court order and allowed Mother to have unsupervised contact with the Children. Ms. Delp testified that the Children also reported that grandmother and Mother were "whipping" them during that time period.

The Children were taken back into foster care in March of 2012. Another Permanency Plan[1] was developed in June of 2012. Ms. Delp testified that Mother's responsibilities were substantially the same each time the Permanency Plan was revised. Ms. Delp also stated that Mother was present each time the Permanency Plan was reviewed in the court room.

Under the Permanency Plan, Mother was required to address her mental health issues and substance abuse issues. Ms. Delp testified that Mother completed a mental health assessment in April of 2014. DCS paid for that assessment. The recommendations of Mother's mental health assessment were individual therapy,

---

[1] The evidence in the record on appeal shows that although the permanency plan was updated several times, Mother's responsibilities remained essentially the same with each revision. As such, we refer in this Opinion to the 'Permanency Plan' in the singular for ease of reading.

medication management, and case management. Ms. Delp testified that the individual therapy was available to Mother because DCS paid for it. Mother began therapy in June of 2014, but did not complete the therapy. She attended one of three appointments scheduled in June, attended one in July, failed to attend any appointments in August, and was discharged in September for noncompliance.

Mother had an A&D assessment in 2012. During that assessment Mother reported substance abuse issues with marijuana. The assessment recommended individual therapy, medication management, and random drug screens. Mother did not comply with these recommendations and did not cease using marijuana. Mother had another assessment done in June of 2013 with similar results of marijuana dependence and similar recommendations.

Ms. Delp testified that Mother had a clean drug screen in November of 2012. DCS started unsupervised visits at that time. Mother then failed a random drug screen in December. DCS requested the December drug screen because they had planned to give Mother a week of unsupervised visitation for Christmas. Mother had a clean drug screen in August of 2014, but Ms. Delp testified that "the drug screen was questionable because the urine was so clear that - - we couldn't get another drug screen after that." DCS requested another drug screen approximately five days prior to trial. Mother could not give a urine screen, so an oral swab was done. Mother told Ms. Delp that she expected this test to be positive because Mother had smoked marijuana six weeks prior to the test.

Mother did complete a parenting class and had intercept services through Youth Villages from late 2012 until January of 2015. Mother also has had supervised visitation. Ms. Delp testified that Mother has not had unsupervised visitation since the fall of 2012 because she has not had a clean drug screen and because DCS still has concerns with her parenting skills and the way she interacts with the Children. Ms. Delp was asked for examples, and she stated:

> One of the examples is, there was a visit at the park this past summer, approximately around July 2014, where the worker had to intervene because mom was cussing and yelling at [the Younger Child]. We've had visits where mom and the aunt have been very inappropriate, talking about the foster mom, at that visit referred to [the Older Child's] clothing as she looked like a slut. We've also had visits where mom just doesn't interact very much with [the Younger Child].

Ms. Delp testified that Mother treats the two Children "[v]ery different." Ms. Delp stated:

3

For example, one visit at the Department, mom was late for the visit, we were standing in the lobby, I was actually present for that visit. [The Younger Child] was very excited to see mom, went through the double doors, held the door open for her. Mom walked right past her to [the Older Child], hugged [the Older Child], handed [the Older Child] the pizza and sat down.

We have witnessed that time and time again at the visits. She just doesn't engage [the Younger Child], where she very much engages [the Older Child] to the point that sometimes [the Younger Child] is standing in the background waiting for a hug, and it never happens.

When asked how this type of behavior affects the Children, Ms. Delp stated:

The girls' behavior over the last several years have [sic] just spiraled out of control. Sometimes they are stable and sometimes they are just - - I don't know how to describe them. A lot of it revolves around, especially for [the Younger Child], when mom doesn't show for visits or when she doesn't show for CFTMs. We anticipate that the next week at school or in therapy or even in the foster home that we're going to have some form of acting out, some form of behaviors.

Ms. Delp testified that Mother visits the Children, but not consistently. Ms. Delp explained:

Since our last court date in February, just because of mom's reaction to the termination petition, we decided that as a team it would be best to have a set schedule for visitation and to move them back to the DCS office. Visits are also [every other week] for two hours. Since our last court date in February, mom's either cancelled or no-showed or rescheduled all of the visits. And what we have right now is she visited twice in February, she visited once in March, no visits in April, and she did contact me in April and asked me to change the visits to Saturday after she had cancelled a visit. And we did work diligently between myself and Youth Villages to make sure that we scheduled three visits in May on a Saturday. . . . She did make those visits.

Ms. Delp testified about the last visit in May stating:

The last visit was a little concerning because mom informed both girls that the fathers' rights had been terminated and that they didn't care about them

and they were no longer involved in their life and they never would be a part of their life. It was very upsetting for [the Younger Child].

Ms. Delp has had contact with both fathers, and she testified that Mother's statements were untrue. Both of the Children's biological fathers reside in North Carolina. Ms. Delp testified about what she did after Mother made the statements to the Children stating:

> What I did is I informed the foster mom, I gave her [the Younger Child's] father's contact, and when we or she felt that it was best for [the Younger Child] to make that contact, we were going to allow that to happen, because when I made contact with him, he informed me that he wanted to have contact with her and he wanted to see her, he just wasn't in the place that he could care for her at this point in time.

The Younger Child's father has children in Africa, and he is in and out of the country.

Ms. Delp testified that Mother reported that she was working at JFG second shift. She also stated that Mother has worked in the past. Mother was making child support payments through May of 2014 on the Older Child and through August of 2013 on the Younger Child.

Ms. Delp testified that the Children were in a prospective adoptive home, where they have been for over two years. When asked about behavior problems exhibited by the Children, Ms. Delp stated: "Behaviors range from being physically aggressive, verbally aggressive, disruptive at school, aggressive with teachers at school, ran away one time but just to the neighbor's house, was able to locate them rather quickly. They are just - - they steal, they lie. There's a lot." Ms. Delp testified that despite the behavior problems the foster mom still wants to keep the Children.

Ms. Delp testified that the behavior problems often appear in conjunction with something going on with Mother. Ms. Delp testified that at the most recent Child and Family Team meeting Mother failed to show, and the Younger Child "became very agitated, was . . . just angry that mom wasn't there, and her response was if she don't care, why should I care." On one occasion when Mother did not participate in visitation the Younger Child "got in trouble at school, she tore the principal's office up, she had wrote some stuff on the desk, and the school had to call, not only her worker, but [also the foster mom], trying to get her to deescalate, and the worker finally had to come to the school to get her on that day."

5

Ms. Delp testified that the Older Child "seems to control her behaviors somewhat a little better now. But she was asked to leave Austin East High School, she was expelled there, and they put her in the Richard Yoakley night school program where she has also been asked to leave just because of the aggressive and disruptive behaviors."

Ms. Delp testified that Mother claims she has not accomplished her goals because she lacks funding and insurance. Ms. Delp testified, however, that although DCS completed referrals for Mother for A&D and has paid for individual counseling, Mother has not followed through. With regard to why the Children are in foster care, Mother claims that the Children are not telling the truth about the situation, and she denies that it happened. Ms. Delp testified that Mother has continuously denied physically abusing the Children.

Ms. Delp testified that the Younger Child would like to be reunited with Mother. The Older Child has not expressed the same wish. Ms. Delp testified that the Older Child has stated that she does not believe that Mother has changed and that she does not feel she would be safe in Mother's house. Ms. Delp testified:

> I think as the case manager that's been on this case for a very long time, that these girls need stability and they need permanency. We see very much when mom is not involved how the behaviors are, and both the girls have said in the past through therapy, through Youth Villages, to myself that they just want to know - - they just want something permanent, they want something stable, they want to konw [sic] where they're going to lay their head at every night.

With regard to Mother's responsibilities, Ms. Delp testified that Mother has not shown a valid driver's license, car insurance, or a legal source of transportation; that Mother needs to complete individual therapy; that Mother needs to demonstrate parenting skills learned in parenting class; and that Mother needs to have clean drug screens. Mother was drug screened on September 19, 2014 and the test was positive for THC. Mother failed to come in for a drug screen in December of 2014. Ms. Delp stated that Mother reports smoking marijuana because of the Children's behaviors. Mother completed parenting class, but has failed to demonstrate skills during visits. Ms. Delp testified that Mother does have housing. Ms. Delp testified:

> These girls have been through a lot of trauma and a lot of physical abuse, and to be in visits, for mom to make them cry during visits, make them cry before court because she's downgrading them and telling them they're not doing what they need to do to get home, is not a good situation for these girls.

6

Ms. Delp testified that the rights of the Older Child's biological father have been terminated, and that termination proceedings were pending against the Older Child's legal father. Termination proceedings also were pending against the Younger Child's father.

Ms. Delp testified that the Children are "pretty much stable in the [foster] home." She stated that there was one occasion where the Older Child failed to come home one night for several hours and one occasion where the Younger Child ran away to a neighbor's house, but Ms. Delp stated that the Children were "more stable now than they ever have been in the foster home." Ms. Delp testified that the foster mom provides a lot of structure for the Children. Ms. Delp testified that she does not believe it would be safe for the Children to be returned to Mother's care at this time "[b]ecause we still have the behaviors with the girls that mom says that she smokes the marijuana for, to control the stress, because of the girls' behaviors."

Hannah Falls, who works with the Youth Villages Intercept Program doing child and family therapy in-home and working with transition cases to prepare parents for children to come home, testified at trial. Ms. Falls worked on this case from March of 2014 through February of 2015. She supervised visits and met with Mother to prepare for the Children to come home and to help Mother satisfy her requirements under the Permanency Plan.

Ms. Falls testified that there were times when she was unable to reach Mother to schedule visitation. When asked how many visits Mother did not have, Ms. Falls stated: "There were six that were not scheduled due to me not being able to contact her, and then two were cancelled by her, two were cancelled by the kids and one was cancelled by the on-call counselor." Ms. Falls testified that two visits were cancelled because the Children wouldn't come and that for several visits the Older Child refused to come.

Ms. Falls testified that they worked on interaction and redirection when needed during the visits. When asked if she had observed verbal interactions that were inappropriate Ms. Falls stated:

> Yes. The incident referred to earlier at the park where mom just - - I was concerned about the way that she addressed the behaviors and it just kind of - - she was addressing them appropriately, and then she just kind of snapped, I guess, and just started yelling and cursing at [the Younger Child].

Ms. Falls testified that Mother was "a lot more engaged with [the Older Child]. There were times when [the Younger Child] was doing things to try to get her attention, and it was sometimes ignored."

Ms. Falls testified that she has talked to Mother about her marijuana use and that they made a relapse prevention plan, but Mother still is using. Mother tells Ms. Falls that she uses marijuana due to "[s]tress. When the kids were there, stress from the behaviors and just the stress from not having them once they were gone." Ms. Falls talked with Mother about other ways of dealing with stress. When asked if Mother was cooperative Ms. Falls stated:

> Yes. When we were able to meet, she seemed very motivated to make the changes. We would make lists of the things that she needed to do. The breakdown would just usually come afterwards, with the follow-through or consistently meeting so we could check up on the follow through.

The Younger Child, who was twelve years old at that time, testified at trial. She stated that she loves Mother, and she would want to live with her if she had the choice. If she cannot go home with Mother, the Younger Child is willing to stay with the foster mom. The Younger Child explained that the foster mom's household includes the foster mom's 14 year old son, 19 year old son, 12 year old niece, and 17 year old nephew plus herself and her sister, who is 14. The Younger Child testified that she shares a room with her sister, and they each have their own bed. When asked how the court would know that the abuse would not happen again if she went back to Mother the Younger Child stated: "She's trying a little bit."

The Older Child, who was fourteen years old at the time of trial, testified that during one visit Mother and Mother's sister called her "a ho' and a slut." The Older Child also testified about the night the Children came into custody, and stated that Mother hit the Younger Child in the mouth with a fist and that Mother hit the Older Child in the face with a fist. The Older Child was asked how she felt when Mother denied that this happened, and she stated: "It makes me feel angry because it feels like she's saying that she wants her kids back but she's still lying about some things that she could just apologize for it, would probably be better." The Older Child testified that she wants to remain with the foster mom. When asked if she thought it would be dangerous to return to Mother's home, the Older Child stated:

> Yes, sometimes I think about it at times when she gets angry, like from the beginning I think it'll be fine because there's people around, but once the people are gone, I feel like she's going to get angry at the fact that we lied or I feel like she's going to get angry at the fact that [the Younger Child],

8

she might still wet the bed now, so I feel like she'll probably get angry and stuff that makes Mom, because Mom has a bad temper at times.

When asked how Mother does at the visits, the Older Child stated: "Lately she's been doing pretty good, 'cause my granny and my uncle have been there, but she's been doing pretty good, but . . . ."

Allison Anderson, a supervisor for foster care at Youth Villages, testified at trial. Ms. Anderson has worked on this case since November of 2014, and she supervises the counselor who works one-on-one with each of the Children. Ms. Anderson testified that she discusses this case weekly with the counselor and others.

When asked what issues Youth Villages is working on with the Children, Ms. Anderson stated: "We are working on the physical and verbal aggression. [The Younger Child's] physical aggression, her most recent was at school, I believe it was last week, and she became physically aggressive with three of her teachers. It took three teachers to calm her down." Ms. Anderson explained that they are trying to get the Younger Child an IEP certified for emotional disturbance, which is why she has not been expelled to date. The Younger Child attends Ridgedale, which is a special school for children with learning disabilities. Ms. Anderson testified that the Younger Child is smart and receives grades of A's and B's, but has behavior problems. She further explained:

> The verbal aggression is a lot of name calling. It's a lot of racial slurs that she uses. She will call herself names, she will call her sister names, she will call, you know, peers and teachers names. Her last incident at school she said, My [sic] mom is going to come up here and beat you. And that was right after their visit.

With regard to the Older Child Ms. Anderson testified:

> [W]e're working on her school behaviors, a lot of just her behaviors that got her thrown out of Austin East where she was skipping class, just a lot of defiance toward public figures, authority figures. She wasn't going to the right classes that she was supposed to go to, she was really just disrupting the classes. And a lot of it is trying to get attention.

Ms. Anderson testified that a time-line of behaviors in relation to visitations was created, and it has been determined that the behavior problems occur after cancelled visits or when Mother does not show, or if there are interactions with family members between visits. Ms. Anderson testified that there is stability during the time periods between visits. Ms. Anderson stated that "both [of the Children] seek attention, positive or neglect

[sic], and they've found that the negative attention - - or that negative behaviors get them attention, so that's their go-to behavior when they feel like they're not being heard or getting what they need." These behaviors occur more at school than at home.

Ms. Anderson testified that the Older Child "said that she wanted to be able to tell the Judge that she didn't want to move home, and she had also said that if she did move home, she was going to be devious." Ms. Anderson testified that the Older Child actually had used the word 'devious,' and that the child "said that she knew she couldn't be good there and she would try to get out of there as quickly as possible."

Ms. Anderson testified that Mother and Mother's twin sister attended a school meeting with regard to the Older Child and that both Mother and her sister "were both yelling. It was - - yes, very chaotic." When asked what Mother said, Ms. Anderson testified: "It was just a lot of blaming, saying 'you people'. I don't remember specific remarks, but it was just a lot of hostility about DCS and Youth Villages, what wasn't being done for her." Ms. Anderson stated that Mother's sister "looked at [the Older Child] and told her that she had demons in her, that she could see the demons, and she started praying, and then she started, you know, saying, well, I can see why you do this. It was still the blaming and yelling." When asked, Ms. Anderson stated that she could distinguish what Mother said from what Mother's twin sister said.

Steven Wilbert, the regional supervisor for Youth Villages Foster Care and Adoptions, testified. Mr. Wilbert oversees the supervisors and front-line staff to ensure that children are being taken care of properly. Youth Villages has been providing services in this case since April 2, 2012, and Mr. Wilbert has been on the case since May of 2013. Mr. Wilbert testified that he was a clinical supervisor on the case and that he "sat in group and consult, organized visitation for the girls, responded to some calls and residual behaviors in visitation and contact with mom." Youth Villages provides individual therapy for the Children once a week and also facilitates medical appointments, provides on-call services, and makes sure the Children's needs are being met. Mr. Wilbert has not worked with Mother.

Youth Villages also responds to calls from the foster mom. Mr. Wilbert stated that a lot of the calls they get are due to behaviors at school. He stated that they also got a call when one of the children ran away one night. The calls have been consistent since April of 2012.

Mr. Wilbert testified that the foster mom has passed the training certified through Youth Villages and that she attends support groups and fifteen hours of training certification per year. Mr. Wilbert stated that the foster mom has "been trained for level three placements, and this entails safety planning, follow through with clinical

10

interventions that my staff implement, deescalation [sic] plans, exit way plans, physiological responses to emotions, subscales, and then behavioral plans, those types of things." Mr. Wilbert testified that the foster mom generally is able to handle the Children without assistance.

The Children were in two other foster homes prior to entering the current one. Mr. Wilbert testified that they exhibited the same types of behaviors in those foster homes that they exhibit in the current foster home. When asked if the Children's behaviors have improved, Mr. Wilbert stated:

> Yes. . . . [Both Children] still struggle with the deescalation [sic] techniques. They have - - you know, I'm not going to say they don't have issues in the home, but the way that they're implemented through - - their deescalation [sic] has improved tremendously in the home setting, they've really bonded, they have found a bond with their treatment mother, I think that has spoken to the progress that they've made. They are able to communicate more their needs, they're open in therapy, I think their trust has increased. So they have shown increased stability in the home setting. It's just wrapping that around with the school. . . . They're able to communicate when they're upset and frustrated, they're not resorting to physical aggression every time that they're escalated, which that's a small step, but it's a big step for them. I think the biggest thing that I've seen the girls transpire over this case is just their ability to communicate in an effective way, so that's really increased for them.

Mother testified at trial and was asked why the Children were in foster care. She responded: "Allegations of abuse. . . . They alleged abuse. . . . My children said that I abused them. . . . They said that I hit them." When asked what the Children were hit with Mother stated: "My fist, I guess. I've heard a lot of different stories." Mother admitted that the agency in North Carolina was concerned with Mother due to her marijuana use, and the agency here in Tennessee was involved with Mother for approximately a year prior to the removal of the Children. Mother stated: "I did spank [the Older Child] that morning, I spanked her and [the Younger Child] that morning. They were fighting each other and they was not listening to me, so I did spank them." Mother was asked about bruises that the Older Child had on her eye, the left side of her face, and her left thigh, and she stated:

> I do recall that. Just as I told my first counselor, and I've had witnesses on that, she was outside fighting that evening, just like that day that that happened with them, she was fighting that evening a little girl that she went to the building around the corner where I had them going, Christenberry,

where I stayed at. They went to school there - - well, not really school, but programs there when they were out of school during the summer. And that's when that occurred, and I was aware of that. I stopped her that evening for fighting, she was fighting a little girl and a little boy actually in the streets. Yes.

Mother denied being responsible for any of the Children's bruises and denied whipping the Older Child with a belt. Mother also denied responsibility for the Younger Child's busted lip and bruises on her head. Mother denied hitting or kicking the Children. Mother was asked about the bruises and injuries the Children had when they came into custody, and she stated the source was: "Them fighting each other. I did not do anything to my kids. I did admit I yelled, I screamed, I was upset but they were fighting already when I stopped them from fighting. I ran upstairs to stop them from fighting, they was slapping and beating on each other." Mother denied ever striking the Children.

Mother was asked if she woke the Children in the middle of the night, and she stated:

I woke them up - - actually I woke my babies up because we had watched a movie that night, and I usually check to make sure that their room is cleaned. I didn't that night, I took them at their word. They had been fighting all day. We sat up a little bit, about close to midnight, and I sent them to bed. When I went to check, because I was still up, I went to check on them, I did wake my babies up and I asked them what did I ask them to do. They told me they were supposed to clean up. I told them - - they was getting out of the bed, I told them they don't have to do it right now, I will wake them up bright and early at six o'clock in the morning, is what I told them, and they can clean the whole house. That's exactly what I told them. And I woke up that morning, they were gone.

When asked again about the night she woke the Children, Mother stated:

I woke them up. Like I said, I watched a movie with them and I didn't check to see if their room was clean, I just took them at their word. Later on that night when I decided to go to bed, I checked in and the room was dirty and I woke them up. And I told them that in the morning I was going to get them up at 6:00 o'clock in morning and they were going to deep clean the whole house, top to bottom, and I was just going to sit there and watch them. I did say that. And I went back to bed.

12

When I got up it was like three something, they were up and I put them back to bed. They was trying to clean up and I told them to lay back down. I'd get them up at - - I said get your ass up 'cause I'm getting you up in three hours for you to deep clean. And I woke up and they weren't there.

Mother insisted that the Children had lied when they alleged abuse. Mother stated:

I didn't know all of this was going to happen. That day they had been physically fist fighting all that day, all that night, and I tried to stop it the best I could. I asked them not to fight, I asked them to stop it. They wouldn't. I even had a witness at the house with me that broke up their fights, even told them when they took me downtown to the Justice Center, the person even told them that he was the one to intervene on the fight, that I did not. But nobody listens, nobody listened, and here I am today.

Mother testified that she has had problems with the Older Child since the Older Child was two years old. Mother stated that the Older Child "got kicked out of every school, very disruptive," and that this started when the child was in kindergarten. She stated that the Older Child "has fabricated a lot of lies on me throughout the years, even before I got to Tennessee. I have even sent her to counseling to understand why. I've never gotten an answer. They all told me she was normal." Mother was asked what kinds of lies the Older Child told, and she stated that the Older Child told people that Mother did not feed her and that she was starving. Mother also stated that the Older Child would "cuss out teachers, tell the teachers that I said for her to do it." Mother stated that she would

have to constantly fuss and raise my voice with [the Older Child] for not going to school, doing right, for stealing iPhones, for stealing money, for stealing wallets, spitting in teachers' faces, cutting hair, just anything. And I guess it kind of rubbed off where when [the Younger Child] started going to school, doing the same things that I never thought that she would do because she was a straight A student.

Mother stated that the Younger Child only began acting out in 2010.

Mother was asked if the Children were in foster care because they told lies, and she stated:

13

Well, I agree with that. If I could take that day back, I would, but I can't. I did not - - I just wish I had paid better close attention to them, not let them fight each other, because I didn't put my hands on my children that day. I tell the same story I've been telling for four years. My story has never changed, and it never will.

Mother was asked why the Children still were in foster care, and she stated:

That has a lot somewhat to do with me, and my ways, of my dependency, when I was on marijuana. But I don't completely fault all of that to myself either. I had a late start, like I said, with my case. My kids was in custody over a year before DCS even paid me any attention, even got me parenting classes, even got me anything that I needed.

I remember my first court case, the Judge ordered random drug tests every week. Never saw a case worker for a year. Like I said, I did complete the parenting classes. A year after they was in custody is when they sent me, I did complete that. A lot of the times, like when I went to therapy, I asked them if they would give me group therapy with my children. They did after a year and a half, they did.

And with that, my kids told the counselor that, you know, they felt bad for lying on me, and the counselor did look me in my face and said some ridiculous things to be a counselor towards me, and after that one day, I never even went back to counseling with my children or anything.

I do the best that I can, and to me every 14 days for two hours, how can you express what you have learned in counseling when you don't have the time? I do the best I can. I just want my children to learn not to lie so much; lies are costly. And it's been hard on me for four years, it really has, and I'm sure just as much as it's been hard on them. I don't take them out of the equation. I know this has been hard on them. It's been hard on me as well.

Mother testified that the last time she used marijuana was "about six weeks" prior to trial. Mother admitted that over two years prior to trial, in February of 2013, the court found that she needed to stop using marijuana, complete the recommended treatment, pass drug screens, and develop an alternate method of coping with disappointment. Mother then stated that the court also "issued weekly drug tests that DCS never did." Mother was told that the order from February of 2013 said nothing about weekly drug tests. Mother then stated: "It was, he ordered random drug tests. My very first court date

14

he ordered random drug tests." Mother then was reminded that her first court date was years prior to February of 2013, and she stated:

> I know. What I'm saying is we all have a part in this. I accept my flaws. I have been clean at times, a lot of times, but I was never getting tested then. So I can't speak on that because that would be irrelevant. I have had my moments, like I say, a lot of the times when my children - - well, it was never both my kids, just one usually refused visits or I had family things going on.
>
> My last incident from my counseling was because I had to go to North Carolina because my aunt died. She recently passed and we was up and down the road actually six months of that time. Now that everything is out of the way, I'm okay, you know, I just want my counseling back, which I've talked with Terrie, Solution Source does not offer medication, so could you change that. I will have go to back to Helen Ross McNabb because Solution Source does not offer medicine.

An order entered in February 2014 found that Mother continued to use marijuana, failed the drug screen at court, and had been missing visits which was upsetting to the Children. An order entered in January of 2015 found that Mother continued to use marijuana, had been discharged from treatment for noncompliance, and was visiting only sporadically. Mother was asked about the fact that she still was using marijuana, and she stated:

> Because then I was using - - in the beginning I was using marijuana a lot. My marijuana use has slowed up. It just so happened that I might at the time have been, in the past, smoking, then two weeks later there comes a drug test. Well, I haven't done that for nine months, I don't hear or see neither one of you.

When asked why the Older Child did not want to visit with her, Mother stated:

> Sometimes I've noticed that when [the Older Child] does something wrong or she doesn't want to hear my mouth, she won't. I feel like when you give kids the right to do what they want at a young age, they're going to do that. If you tell a child, oh, you will have to go to this, what do think [sic] they're going to do? They're not going to do it.
>
> So I feel like it's wrong to tell a child that it's okay to not visit because I can't get that time back. Four years is already gone, and it makes

me feel worse everyday because what can I do? I try the best I can do. I don't know all the time about [the Older Child's] visits. Like I said, she hasn't always had one of those moments. I try, I try to reach out to her to see exactly where did I go wrong at. And, like I say, I hear different things every time.

You all tell me she don't want to come home. That's not what she was saying on Saturdays [sic] visits, so I can't - - like I say, if those ain't lies, I don't know what is. She tells you one thing. I can't prove she said it or didn't say, just like you can't prove if she said thing to me that she did or didn't say. She tells me she wants to come home, but she still would like to visit with [the foster mom]. But here in the courtroom you're telling me she says she don't want to come. So like I said, I don't know what to believe because when she sees me is one story, when she sees you all it's another.

Mother insisted that she never told her daughter that she was dressed like a slut or a whore. Mother stated that her twin sister did that and that Mother defended her child and the foster mom. Mother stated:

I don't know what prompted her to talk to [the Older Child] like that but I did defend my child and [the foster mom]. I told my sister that I don't care what she might've heard about [the foster mom], I had never heard anything bad about [the foster mom]. I liked her. I told her not to talk to my child. It actually became an argument between me and my sister after we left that visit. My sister hasn't visited any more since then.

Mother admitted that she thinks the foster mom is "a God send," and that she thinks the Children are being treated well by the foster mom.

Mother testified that she was employed at JFG working second shift and had been for approximately a month and a half. Mother testified that prior to that, Mother worked at McDonald's for over two years.

Mother insisted everything now was different. When asked what was different Mother stated:

What you have to realize is this, it was a whole big issue, you can't see that, you only see me when you come to court. It's a whole bigger issues than what it used to be in the beginning. I used to smoke all the time, all the time, all the time. I don't do that anymore. Yes, there are moments where

16

marijuana is still in my system, but it's not like it was. I couldn't do nothing, I couldn't function unless I had some marijuana, and I can do that now, I guess a lot that I can do. It's just that I don't have the time to display it, I can't show you everything in two hours.

My home is loving, I care about my kids, I'm a totally different person. I just want to be able to show my kids that I'm a good person, I'm a good mother. I felt like I was taken for granted because a lot of issues came from basically when I couldn't buy them what they wanted. They always want cell phones. I couldn't buy a cell phone, they'd go out and steal one. I can't give you an extra $20 this week, they'd go out and steal it. So, I mean, I'm just hoping that some of those issues that they have had has subsided also.

When asked how things would be different now, Mother stated: "It would be a lot different. I have a lot of love to give." Mother then was asked if that was different, and she stated:

Yes, a lot of – I've learned how to cope during my process of through my hurt, through my rejection, I've learned how to talk better with my children. I've learned how to accept things, how to come to terms with things. I've accepted and learned a lot during my therapy sessions and I feel like I would be a better mom. I was never a bad mom but there's a lot that I have learned through this work in process and that's a lot. And one thing that I've overall learned was patience. . . . I was dealing with a lot with the kids. I had to learn patience on their understanding, their needs, just a lot of, you know, conversation, understanding where they were coming from. Some things that you might just push to the side, you know, you listen to them. It goes to pass, I've learned how to savor every word, understand better because I had to be alone for four years. So I have learned a lot of patience.

Mother was asked if she saw a difference in the Children's behavior, and she stated that she had "noticed maturity in my children."

Mother was asked what she thought she still had to do, and she stated:

I still have to be strong when it comes down to temptation of marijuana at times. I feel I have to be stronger for my children, which I think I have. It's always, as long as your kids there [sic], there's always strength and to

17

better yourself and I'm willing to continue - - to continue to better myself. I don't want to give up and I'm not going to.

Even when they come home, if and when they come home, I'm still going to continue therapy, I'm still going to keep trying to better myself, I'm still going to keep bettering myself as a mother for them. I'm not going to quit.

Mother testified that she believed she had "completed everything on what I was supposed to be doing except for that every now and then, marijuana use." Mother admitted that the drug test done on May 15, 2015 was positive for marijuana. Mother was asked why the Children remained in foster care, and she stated it was because of her marijuana use. Mother was asked if that was the only reason, and she stated:

To me, yeah. I tried to do everything that I know to do. Like I said, I have services and they got stopped. All this has not just been my fault. I take my responsibility in the things that I have done. And I think that I have done a lot to prove to myself and to my kids, I have done right things regardless of what some downfalls may look like, I feel like I have done good.

The Children's foster mom ("Foster Mom") testified that the Children have lived with her since November 5, 2012. Foster Mom's household consists of her, her son who is 14 years old, her nephew who is 17 years old, her niece who is 12 years old, and the Children. Foster Mom testified that her niece and nephew's mother died, so they live with her.

Foster Mom was asked if the Children's behavior has changed, and she stated: "Not much. But the fighting has gotten a little better, but other than the other behaviors, we're still working on that but it's still - - the behaviors are still there." Foster Mom testified that the Children told her they had lied about the night they came into custody, and she made them tell the therapist. She stated that they told her that Mother "did bust [the Younger Child's] lip, but that everything else was a lie."

Foster Mom testified that the Older Child got kicked out of high school for failing to attend class and then got kicked out of alternative school for not following school rules. The school did not tell Foster Mom which rules the Older Child failed to follow. Foster Mom testified that the Younger Child has been put on an S-team, which means that the school is dealing with her rather than suspending her or sending her to alternative school. Foster Mom testified:

18

She just recently - - she told me that another student had spit in her face and so she was going to fight this student and it was three teachers who were trying to control her, you know, stop her from fighting, well, she fought all three teachers. She had blood on her shirt that she had drawn blood on the teacher where she was scratching them, fighting them, just do whatever to try to get to the little girl and, you know, basically they said they were just going to deal with it basically.

Foster Mom testified that the Children still fight at home. She stated that they would fight and the Older Child would pull out chunks of the Younger Child's hair leaving "like bald spots in her head," and that she did this about a month prior to trial. Foster Mom stated, however, that "it used to be every day where I could intervene with a fight, now it's maybe twice a month." Foster Mom testified that the Younger Child still wets the bed.

Foster Mom was asked if she wanted to adopt the Children, and she stated: "If they don't get to go home with Mom, then I will. But I feel like, you know, if Mom is willing to take her kids and if they want to go home, I want them to have that relationship." Foster Mom testified that she and Mother have been working together to deal with some of the discipline issues. Foster Mom was asked if she would continue to help if the Children were returned to Mother's custody, and she stated: "She can call me any time, and like if she need a break, she can say hey, can you watch these girls or can they stay overnight, and I'd say I'm on my way, so yeah, definitely."

After trial the Juvenile Court entered its detailed order on June 23, 2015 terminating Mother's parental rights to the Children after finding and holding, *inter alia*:

> From all of the above and the entire record, the Court finds the following by clear and convincing evidence.

### I

> 1. [The Younger Child] was born out of wedlock to [Mother] . . . in . . . 2003. [The Older Child] was born out of wedlock to [Mother] . . . in . . . 2000. . . . The temporary custody of these children was awarded to the State of Tennessee, Department of Children's Services, for the second time on May 29, 2012, by order of the Juvenile Court of Knox County, Tennessee; they have been in foster care continuously since that date. The termination petition was filed against [Mother] on January 22, 2015.

19

## II

1. The children were removed from [Mother's] custody due to physical abuse. [Mother] and the children had watched a movie together, after the girls had told their mother they had cleaned their room, and then the girls went to bed. [Mother] became angry when she checked on her children later and discovered that they had failed to clean their room and that [the Younger Child] (then 8) had not changed her sheets after wetting her bed the night before. [Mother] woke the children after midnight and a verbal altercation escalated into a physical assault, where [Mother] hit both of her children with her fists and "busted" [the Younger Child's] lip. The children ran from the home after this particular incident. They were located by law enforcement and refused to return. Injuries to [the Younger Child's] face were documented. The children also reported previous incidents of being whipped with a belt and the Department of Children's Services had previously investigated such reports, had observed marks on [the Older Child's] face and thighs, and had placed intervention services in the home, apparently without success. [The Older Child] reported that her mother had threatened her with a broom stick in the past, held the stick across her throat, and told her to 'fight her like a grown woman'. When interviewed by the Department of Children's Services, [Mother] admitted waking her children at 1:00 AM and talking to them about cleaning their room, behavior at school, and other issues from the past. She denied any discussion about wetting the bed, denied any physical assault, and denied touching the children or using a belt in the past year, saying she had been told that physical discipline was wrong. The belt was found draped over a kitchen chair; a relative in the home overhead [sic] the fight and confirmed the children's report of what was discussed. Although denying the children's specific allegations, [Mother] stated that she had been under a great deal of stress; that she had difficulty managing the children's behavior; and that she had started using marijuana again.

2. Upon their removal from [Mother's] custody, the children were placed immediately in kinship foster care with their maternal grandparents and full legal and physical custody was released to the grandparents by order of this Court on March 6, 2012. That placement lasted only a few more weeks. The grandparents allowed the girls to return to live with their mother before the ink was dry on the order despite the requirement that she have only supervised visitation. Grandmother admitted that she, too, had been whipping the children because they needed to learn how to respect their elders. She knew that her daughter was continuing to use marijuana and [Mother] admitted that she was still under stress and still using. [The Older Child] reported that her

mother was not ready for them as she did not know how to talk without yelling and was lazy. The children returned to foster care.

3. The initial permanency plan was developed at a Child & Family Team Meeting on October 7, 2011, with [Mother's] presence and participation. Among other things, the plan required that [Mother] (a) complete a mental health assessment, follow resulting recommendations, and take medication only as prescribed; (b) complete an alcohol and drug assessment, follow resulting recommendations, and pass random drug screens to demonstrate sobriety; (c) and complete a series of age-appropriate parenting classes, learn appropriate discipline techniques, and demonstrate learned skills during visitation. She was also expected to visit regularly and to pay child support. Those responsibilities have remained essentially unchanged to the present despite periodic revisions of the plan.

4. [Mother] continues to deny that she ever abused her children. Her explanation for their removal into foster care was that they fabricated lies. She reported that she had experienced difficulty with [the Older Child] beginning when that child was 2 (when she was terrorizing other children in preschool) and had tried to get help for her, first in North Carolina and then in Tennessee, since that time. [The Younger Child] had not been problematic until 2010 but then started taking after [the Older Child]. From the time [the Older Child] was 5 and [the Younger Child] was 3 the girls have been physical [sic] aggressive toward each other, fighting each other, slapping and beating on each other. She testified they had been fighting all day on the day of the incident leading to their removal. She admitted that she had awakened them to warn them that in the morning they would have to clean the whole house and then discovered at 6:00 AM that they were gone. As to the documented injuries, she claimed that the girls had hurt each other.

5. [Mother] insists that there is no reason for her children to still be in foster care. If she had them today, she could clothe and feed them and get them to their appointments, she could meet their needs. She has had appropriate housing and a job. On the other hand, she has not made even a token child support payment since August 2014. She claims she has completed everything and has been ready for years. She could not, however, explain what would be different now. She stated that she loves her children and is lost without them but there is only so much she can do. She believes they need family therapy.

6. [Mother] has a lengthy history of reliance on marijuana and testified that she still has a strong temptation to use. She has completed several alcohol and drug assessments with recommendations that she participate in individual counseling and medication management to learn coping skills other than turning to marijuana. The most recent assessment was completed at The

Solution Source in April 2014 with the same recommendations. Those services were available to her through The Solution Source. [Mother] began therapy there at the Department's expense in June 2014. She attended one appointment in June and one appointment in July; she was then discharged for non-compliance (failing to attend) in September 2014. Her drug screens have been consistently dirty for marijuana. Her most recent hair follicle test, collected on May 15, 2015, was again positive for marijuana as was the swab test conducted on May 22, 2015. She testified that she had used marijuana a lot in the beginning but had now "slowed down". She explained that she had not completed counseling because her aunt was dying in North Carolina but is ready to begin again and has asked the children's case manager for a new referral.

7. [Mother] completed Common Sense Parenting classes at the Department's expense. She has not, however, demonstrated learned skills or a substantial change in her behavior during visits with her daughters. The Youth Villages supervisor has had to intervene due to [Mother] ignoring personal space and cursing her children. Her visits have not been consistent; she has missed about one-third of those visits. During visits she has clearly favored [the Older Child], ignoring [the Younger Child's] attempts to gain her attention. Several times the children have refused to see her. An attempt at family therapy was unsuccessful as it quickly deteriorated.

8. [The Younger Child] testified sitting on her mother's lap. She told this Court that she was "pretty mad" at her mother for not showing up at visits consistently and for not showing up at a recent Child & Family Team Meeting but still wants to go home. When asked how the Court could be sure "it won't happen again", [the Younger Child] replied that "she's trying a little bit." She did not recant the allegations of physical abuse despite wanting to go home.

9. [The Older Child], on the other hand, was clear that she does not want to return to her mother's care, does not want to visit, and wants to be adopted. When asked if it would be safe for [the Younger Child] to return home even if [the Older Child] does not, she replied that it would not be safe because [the Younger Child] still wets the bed. She acknowledged that her foster mother had encouraged her to give her mother a second chance and she had done so, but related an incident of name-calling by her mother ("called me a whore") and expressed her feeling that her mother doesn't care.

10. The children continue to have serious behavior problems. They seek attention and negative behavior is their way to get it. Both children testified that they still have arguments but are doing better, learning not to fight. On the other hand, their foster mother's report was not encouraging. The girls continue to fight with each other, though not as much - perhaps

twice a month instead of every day. They pulled each other's hair out a month ago. They get into fights at school. [The Older Child] just stopped going to class and was kicked out of Austin East. She was then kicked out of Richard Yoakely for not following the rules. Exactly what was at issue has not been determined. [The Younger Child] was described as "not good at all at school". She recently got into a fight with another girl who had spit in her face. While trying to get at that girl she involved 3 teachers and drew blood.

11. Upon these facts, the Court finds that [Mother] has abandoned these children in that [Mother] has willfully failed to support or make reasonable payments toward the support of the children for four (4) consecutive months immediately preceding the filing of the petition in this cause. She was working, she had the ability, she had a previous history of compliance. She just stopped.

12. The Court further finds that [Mother] has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement. Her responsibilities have been essentially the same for more than three years. She has been offered a bevy of services but has not completed any. Instead of keeping her appointments, continuing on her medication, going to therapy, she's smoking marijuana. Her responsibilities were not difficult: go to therapy, quit smoking marijuana, pay child support. She didn't do it. She was discharged from therapy for non-compliance last September after attending only two appointments and has now asked for a new referral. She doesn't get unlimited chances.

13. These are still difficult children. The history shows that they have been difficult since they were small, too difficult for their mother to handle. She has not taken advantage of the services designed to assist her in developing the skills necessary to care for them. And she has not taken any responsibility for her behavior, for her role in their removal or for her failure to complete the permanency plan; everything is somebody else's fault. As a result of her noncompliance, the Court finds that the children have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist; other conditions persist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of [Mother]; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned to [Mother] in the near future; the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

# III

1.   [Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. She is not there yet, maybe not ever. According to her own testimony, she has been trying without success since [the Older Child] was two. [Mother] has missed about one-third of her recent visits. She brought her sister with her, creating an incident. She has been difficult to contact. And she did not appear to participate in the most recent Child & Family Team Meeting. The children do have a meaningful relationship with their mother. The Court does believe that that [sic] [Mother] has shown brutality and physical abuse neglect toward these children. The Court can see how she may have been pushed to "popping" one, but not with a fist and not in the face, that cannot be condoned. [Mother] continues to self-medicate with marijuana. That is a poor and illegal substitute for the medication she is supposed to be on. She is not mentally healthy enough herself to take care of troubled children. And she has not paid child support.

2.   Termination proceedings are pending against the children's respective fathers.

3.   The Department of Children's Services has made reasonable efforts toward achieving permanency for these children.

4.  The children are entitled to a safe, secure and loving home. Their foster mother testified that she will adopt them if they can't go home. [The Older Child] wants to be adopted there. [The Younger Child] wants to go home but would be happy being adopted by her foster mother if home is not an option. Determining the best interest of children is a lot harder when they are not doing well in their placement. These children are not. The Court urges the Department of Children's Services to convene a Child & Family Team Meeting immediately to address the viability of this placement. Their mother loves these children but cannot meet their needs. Their current foster mother loves them as well but it is not clear to the Court that she is meeting their needs either.

5.  It is, therefore, in the best interest of [the Children] and the public that all of [Mother's] parental rights to these children be terminated and the complete custody, control, and partial guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption in loco parentis.

Mother appeals the termination of her parental rights to the Children to this Court.

## Discussion

Although not stated exactly as such, Mother raises four issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for abandonment by willful failure to pay child support; 2) whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2) for substantial noncompliance with the permanency plan; 3) whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions; and, 4) whether the Juvenile Court erred in finding that clear and convincing evidence was proven that it was in the Children's best interest for Mother's parental rights to be terminated.

Our Supreme Court recently reiterated the standard of review for cases involving termination of parental rights stating:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T*., 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T*., 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of act and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, No. M2014-00453-SC-R11-PT, 2016 WL 363993, ___ S.W.3d ___ (Tenn. Jan. 29, 2016) (footnotes in original but renumbered).

We first consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for abandonment by willful failure to pay child support. As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or

omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2014). In pertinent part, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the a [sic] parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2014).

With regard to this issue the Juvenile Court specifically found, *inter alia*:

[Mother] insists that there is no reason for her children to still be in foster care. If she had them today, she could clothe and feed them and get them to their appointments, she could meet their needs. She has had appropriate housing and a job. On the other hand, she has not made even a token child support payment since August 2014.

* * *

[T]he Court finds that [Mother] has abandoned these children in that [Mother] has willfully failed to support or make reasonable payments toward the support of the children for four (4) consecutive months immediately preceding the filing of the petition in this cause. She was working, she had the ability, she had a previous history of compliance. She just stopped.

29

The evidence in the record on appeal as discussed more fully above does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's determination that grounds were proven to terminate Mother's parental rights to the Children for willful failure to pay child support.

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2) for substantial noncompliance with the Permanency Plan. As pertinent, Tenn. Code Ann. § 36-1-113(g)(2) provides:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (2014).

With regard to this issue, the Juvenile Court specifically found, *inter alia*:

> The Court further finds that [Mother] has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement. Her responsibilities have been essentially the same for more than three years. She has been offered a bevy of services but has not completed any. Instead of keeping her appointments, continuing on her medication, going to therapy, she's smoking marijuana. Her responsibilities were not difficult: go to therapy, quit smoking marijuana, pay child support. She didn't do it. She was discharged from therapy for non-compliance last September after attending only two appointments and has now asked for a new referral. She doesn't get unlimited chances.

The evidence in the record on appeal, as discussed more fully above, shows that, among other things, Mother was discharged from therapy for noncompliance, that despite attending parenting classes Mother has failed to demonstrate appropriate parenting skills, that Mother continues to deny abusing the Children, and that Mother continues to use marijuana. The evidence in the record on appeal does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that grounds were proven to terminate Mother's parental rights for substantial noncompliance with the Permanency Plan.

Next, we consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions. As pertinent to this issue, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the a [sic] parent or parents or a guardian or guardians, still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the a [sic] parent or parents or a guardian or guardians in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (2014).

With regard to this issue the Juvenile Court specifically found, *inter alia*;

These are still difficult children. The history shows that they have been difficult since they were small, too difficult for their mother to handle. She has not taken advantage of the services designed to assist her in developing the skills necessary to care for them. And she has not taken any responsibility for her behavior, for her role in their removal or for her failure to complete the permanency plan; everything is somebody else's fault. As a result of her non-compliance, the Court finds that the children have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist; other conditions persist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of [Mother]; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned to [Mother] in the near future; the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

We need not reiterate the evidence in the record on appeal with regard to this issue as it is discussed fully above. The conditions that led to the Children's removal from

Mother's custody still remain. Mother refuses to take responsibility for her own actions and she continues to use marijuana. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding by clear and convincing evidence that grounds were proven to terminate Mother's parental rights for persistent conditions.

Finally, we consider whether the Juvenile Court erred in finding that clear and convincing evidence was proven that it was in the Children's best interest for Mother's parental rights to be terminated. When making a best interest determination a trial court shall consider the non-exclusive list of factors contained in Tenn. Code Ann. § 36-1-113(i). With regard to this issue, the Juvenile Court specifically found:

> [Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. She is not there yet, maybe not ever. According to her own testimony, she has been trying without success since [the Older Child] was two. [Mother] has missed about one-third of her recent visits. She brought her sister with her, creating an incident. She has been difficult to contact. And she did not appear to participate in the most recent Child & Family Team Meeting. The children do have a meaningful relationship with their mother. The Court does believe that that [sic] [Mother] has shown brutality and physical abuse neglect toward these children. The Court can see how she may have been pushed to "popping" one, but not with a fist and not in the face, that cannot be condoned. [Mother] continues to self-medicate with marijuana. That is a poor and illegal substitute for the medication she is supposed to be on. She is not mentally healthy enough herself to take care of troubled children. And she has not paid child support.

Our review of the record on appeal reveals that the Juvenile Court considered all of the relevant factors when making its determination regarding the best interest of the Children. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding by clear and convincing evidence that the termination of Mother's parental rights is in the best interest of the Children.

As grounds for terminating Mother's parental rights to the Children were proven by clear and convincing evidence, and it was proven by clear and convincing evidence that termination of Mother's parental rights is in the Children's best interest, we find no error in the Juvenile Court's June 23, 2015 order terminating Mother's parental rights to the Children.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Tanisha M.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

33